MARK L. POLLOT, ESQ.
7227 West Potomac Drive
Boise, Idaho   83704
Telephone:   (208) 867-4335
E-mail:       mpollot.crc@centurylink.net
California Bar No.  136161

John W. Hoffman
Nevada State Bar No. 857
Hoffman, Test, Guinan & Collier
429 West Plumb Lane
P. O. Box 187
Reno, NV 89504
Phone: (775) 322-4081
Facsimile: (775) 322-3841
Email: office@htag.reno.nv.us

ATTORNEY FOR PLAINTIFFS

NEVADA ASSOCIATION OF COUNTIES, and
NEVADA FARM BUREAU FEDERATION

3:13-cv-00712



FILED ____ RECEIVED
____ ENTERED ____ SERVED ON
COUNSEL/PARTIES OF RECORD

DEC 3 0 2013

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

|  |  |
|---|---|
| NEVADA ASSOCIATION OF COUNTIES, a Not-for-Profit Organization; NEVADA FARM BUREAU FEDERATION, a Not-for-Profit Organization, <br><br> Plaintiffs <br><br> vs. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR; a Department of the United States, THE HONORABLE SALLY JEWELL, in her capacity as Secretary of the Interior; THE BUREAU OF LAND MANAGEMENT; NEIL KORNZE, in his capacity as principal | Civil No. <br><br> COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTION, AND OTHER RELIEF |

Paid Amt $ 400  Date 12/30/2013
NVRNO-
Receipt # 2069  Initials KMR

Deputy Director, Bureau of Land )
Management; EDWIN ROBERSON, in his )
capacity as Assistant Director, Renewable )
Resources and Planning, Bureau of Land )
Management; AMY LEUDERS, in her capacity )
as State Director, Nevada State Office, )
Bureau of Land Management; and DOES )
1-50, )
)
)
            Defendants. )
_____ )

# I.

## PRELIMINARY STATEMENT

## A.   NATURE OF ACTION

1.    This action seeks a declaratory judgment, mandamus, injunctive relief,

and such other relief as the court deems appropriate requiring Defendants United

States of American, the Honorable Sally Jewell, Neil Kornze, Edwin Roberson, Amy

Leuders, the Department of the Interior, the Bureau of Land Management, and Does 1-

50 (jointly "Defendants") and/or their successors in office, agents, and employees where

appropriate, to comply with the requirements of, and to perform within the State of

Nevada the duties imposed by, the Wild Free-Roaming Wild Horse and Burro Act of

1971 as Amended (16 U.S.C. § § 1331, *et seq*.) (hereinafter the "WFWHBA" or "The

Act") and to acknowledge and adhere to law, regulation, and procedures imposed by

the Act or promulgated thereunder.  Defendants' Department of the Interior and Bureau

of Land Management's regulations promulgated pursuant to the Act are found at 43

CFR Part 4700.  Specifically, the Defendants have, with respect to the matters set forth

below:

(a)     directly and/or indirectly denied that applicable provisions of law govern their regulatory actions as alleged in more detail herein below and/or have failed to comply with those provisions of law and their own regulations;

(b)     unlawfully withheld action;

(c)     unreasonably delayed action; and

(c)     placed wildlife, fish, water, and threatened and endangered species and their habitats in serious jeopardy;

(d)     caused substantial injury to private property, the protection and preservation of which is the duty and responsibility of the Counties of the State of Nevada subject to the police powers of the State and the Counties; and

(e)     has impaired and poses a substantial threat to further impair the ability of the Counties of the State of Nevada to protected the health, welfare, and safety of the residents and citizens of the State of Nevada and its Counties.

2.     Plaintiffs request that this Court issue a Judgment declaring the duties and responsibilities of Defendants in the matters alleged herein pursuant to the Declaratory Judgment Act (28 U.S.C. §§ 2201-2202).

(a)     Such matters include, but are not limited to, the obligations of Defendants under the Act to manage wild, free-roaming horses and burros in a manner that is deigned to achieve and maintain a thriving natural ecological balance on the public lands.  (The use of the term "wild" in the

allegations of this Complaint is used as a term contained in the Act and is not intended to indicate or agree that said animals are "wild animals" in the technical or legal sense as they are not wild animals for such purposes, but are feral animals within the meaning of Nevada law and the law of most, if not all, states, particularly in Nevada water law or wild animal regulations.)

(b)       In so doing, the Secretary of Interior is required consider the recommendations of qualified scientists in the field of biology and ecology, some of whom are required to be independent of both Federal and State agencies.

(c)       As set forth further below herein, defendants have a general, mandatory duty under the Act to – among other things – protect the natural ecological balance of all wildlife species which inhabit such lands, and to maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands, and to remove excess animals. 16 U.S.C. § 1333(a)(1) and (a)(2).  Defendants are obliged not only to preserve a "natural ecological balance" and to protect wildlife, they are equally obliged to protect the lands within the State of Nevada and other states from deterioration caused by the presence of wild horses and burros as defined by the action and maintain the multiple use of the affected lands.  16 U.S.C. § 1332(f).  As further alleged herein below, the Act prescribes specifically the actions that have to be taken and the priority and order in which these must be accomplished.  Defendants have

failed to comply with these obligations in the State of Nevada in the manner alleged herein below.

3.     Plaintiffs also request that this court issue such orders as are necessary to:

(a)     require Defendants to adhere to the law, as further described herein below;

(b)     follow the processes outlined in its own regulations and directives;

(c)     adhere to the policies established by Congress for the management of wild horses and burros in the affected areas of the State of Nevada alleged herein below;

(d)     set aside illegal and improper management actions alleged herein, such as the stockpiling of horses and burros in holding areas without compliance with the mandatory provisions of the the Act;

(e)     take actions unlawfully withheld and/or unreasonably delayed; and

(f)     take steps to remedy the damage done by their noncompliance.

4.     This action arises under the above-cited Wild Free-Roaming Wild Horse and Burro Act of 1971, as amended (16 U.S.C. § § 1331, *et seq.*), the Administrative Procedure Act, 5 U.S.C. §§ 551,*et seq*, (the "APA"); the Due Process Clause of the U.S. Const., Amendment V, and other federal statutes and regulations as set forth herein below.

5.     First and foremost, Defendants' failures to properly follow the law have gravely harmed, and will continue to gravely injure the very animals that the Act was established to protect.  Both official reports and individuals have described the effects of

a failure to properly implement the Act on the animals themselves.  Free-roaming horse and burro herds in Nevada are frequently observed to be in malnourished condition, with the ribs and skeletal features of individual animals woefully on view and other signs of ill-health readily observable.  At least one individual was so disturbed by the condition of horses he observed that he demanded of the local BLM office that they gather those horses together or the individual he would notify his media contacts.  The animals were then promptly removed.  In addition, Defendants' failures to comply with the provisions of the Act likewise damage the rangelands located within the State and Counties of Nevada, in which the members of Plaintiff NACO have responsibility to protect the health, safety, and welfare of the citizens and residents thereof, the economic viability of the counties and communities located therein to which the members of Plaintiff NACO have duties and responsibilities, the economic and associational interests of Plaintiff NFB and its members, further alleged herein below, and the viable animal and plant species, including – but not limited to – plant and animal wildlife in the affected areas the protection of which is the interest and reason for formation of Plaintiff NWC as further alleged herein below.

## II.

## JURISDICTION AND VENUE

## A. JURISDICTION

6.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, which statutes,

regulations, and rules and constitutional provisions are set forth in more detail *infra*; the complained-of conduct, unreasonable delay, and failures to act create an actual, justiciable controversy; and the actions of the Defendants are made reviewable under the APA (5 U.S.C. §§ 701-706, and 33 U.S.C. § 1365, 16 U.S.C. § 1540, *inter alia*), which waived the sovereign immunity of the United States for matters within its purview, and the complaint-of-conduct, unreasonable delay, and failures to act constitute continuing wrongs.  Jurisdiction is also conferred by the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.  The acts alleged herein were undertaken by the agents, agencies, Departments, and employees of the United States under color of and invoking as their authority the laws and regulations of the United States.

7.     All prerequisites to this Court's jurisdiction, including but not limited to the exhaustion of administrative remedies, have been met, or are excused in that such acts would be futile.  Among other things, as alleged in further detail *infra*, Plaintiff Nevada Association of Counties ("NACO") communicated with the Secretary of the Interior on at least two separate occasions by written correspondence setting forth in detail information which triggered the Secretary's obligations to make determinations and take actions pursuant to the Act to identify and cure excess populations of horses and burros, failures to maintain proper inventories, failure to maintain ecological balances, maintenance of improper Herd Management Areas, failure to protect multiple uses, and the like.  The Secretary's Office took months to respond to said letters, but took no actions to cure the acts and failures to act brought to the Secretary's attention.  Indeed, the letters finally received in return admitted to deficiencies noted by Plaintiff NACO.  No permitting procedures, decisional processes, appeal processes, or other similar

administrative processes exist for Plaintiffs to utilize or exhaust.

**B.    VENUE**

8.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2)and (e)(2) in

that a substantial part of the events or omissions giving rise to these claims has

occurred within the federal judicial District of the State of Nevada, and, further, at least

one Defendant resides within the State of Nevada within the meaning of 28 U.S.C. §

1391(e) and further under 33 U.S.C. § 1365  (suit under this subsection may be brought

in the judicial district in which the violation occurs).

### III.

### PARTIES

**A.    PLAINTIFFS**

9.    Plaintiff Nevada Association of Counties ("NACO" or "the Association")

was founded in 1924.  It a nonpartisan, nonprofit corporation which represents all 17

counties in Nevada, the principal political subdivisions of the State of Nevada.  Its

fundamental purpose is to enable the counties to cooperate and to work together on

matters of mutual interest.  The counties, in turn, have the responsibility for protecting

and forwarding the interests of their citizens and residents, including, but not limited to,

protection and promotion of the public health, safety, and welfare and the protection of

the environment within their borders as well as fostering positive economic conditions

within their borders.  The counties are represented in NACO by elected officials of those

counties and, for the purposes of legal actions, NACO qualifies for associational

standing.  Further, NACO has the ability and right both to participate in federal

administrative proceedings under wide variety of circumstances and – should it become necessary, pursuant to the Administrative Procedure Act ("the APA") (5 U.S.C. § 501, *et seq.*) – participate in or to bring litigation as "aggrieved" persons or as parties whose legal interests have been injured;

(a)   NACO members, individually and collectively, have a long-standing, and intense interest in protecting, as well as legal obligations to protect, the values and natural resources addressed herein and to protect the people and lands in the State of Nevada in which unlawful conditions exist as a result of the actions and failures to act of defendants alleged herein;

(b)   Most, if not all members of NACO have located within their borders, Herd Management Areas ("HMAs"), otherwise have located within their borders, populations of wild horses or burros outside of properly designated HMAs, or are in other ways adversely affected by populations of horses and/or burros as to which Defendants have legal responsibilities which they have failed to meet. Similarly, the State of Nevada and the Counties therein, which comprise NACO, have suffered adverse impacts on their tax base and their consequent ability to provide police, fire prevention and fighting resources as a result of the actions and inactions of Defendants;

(c)   Individual NACO members are environmentally affected when range lands within their boundaries deteriorate as a result of Defendants' failure to control excessive populations of horses and burros, *inter alia*. They are similarly affected by the loss or diminution of vegetation and animals in

affected areas, decreases in water availability, fires resulting from the same, and the attendant diminishment of wildlife habitat and plant life due to poor rangeland and agricultural land health.  They are likewise affected from the decrease in economic viability of agricultural and other activities within their borders due to Defendants' actions and failures to act including, but not limited to, the decrease in tax revenues needed for them to carry out their legal responsibilities such as ensuring the health and safety of the citizens and residents of said Counties.  The ability of NACO members to have strong protection programs in their communities are adversely affected by the loss of revenues to those communities and the individuals and businesses in them caused by improper or unlawful activities or lack of action by the Defendants.  Similarly, the citizens and residents of NACO members are adversely affected by the restrictions placed on their access to and use of lands in the Counties which have resulted from the actions and inactions of the Defendants herein alleged which, in turn, adversely affects the Counties;

(d)      The failure of Defendants to meet their mandatory duties under the Act is also a factor in increasing the risk that citizens and residents of NACO member Counties – as well as those traveling through Nevada and its Counties – will be injured or killed in motor vehicle accidents involving the horses and burros.  Such incidents have occurred, as alleged herein below.  Counties provide emergency services which must deal with such accidents when they occur.  The same accidents not only kill or injure

individuals, they result as well in property damage

(e)     Citizens and residents of the member Counties in NACO also enjoy the presence of healthy populations of free-roaming horses and burros and are injured when the failure of the Defendants to comply with the provisions of the Act.

(f)     NACO and its members are and its members are therefore aggrieved parties within the meaning of the APA, *supra*.

10.     Plaintiff Nevada Farm Bureau Federation ("Farm Bureau" or "NFBF") is a not-for-profit, membership organization composed of County Farm Bureaus and individual farmer/rancher and associate members.  Its mission statement is: "Nevada Farm Bureau is the Voice of Nevada's agriculture, promoting, preserving, and resolving challenges through advocacy, education, and leadership." It is Nevada's largest general agriculture organization and it is a grassroots organization, the purpose of which is to protect farmers and ranchers against laws and other governmental actions or inactions that could potentially have a negative effect of their ability to be in agriculture and to successfully engage in agricultural activities and related businesses, which abilities may threatened by improper and unlawful governmental activity.

(a)     The ability of NFBF members to live and work in the State and Counties of Nevada are adversely affected by improper governmental actions, unlawfully or unreasonably withheld or delayed actions, or other improprieties of Defendants which give rise to unhealthy environmental conditions on the range- and other agricultural lands of Nevada.   Such conditions adversely affect NFBF members because ranching and other

agricultural activities depend on the availability of forage, water, and/state or federal permits, *inter alia*.

(b)     The failure of Defendants to comply with the obligations and mandatory duties imposed by the Act has resulted in massively increased and out of control populations of free-roaming horses and burros and an inability of the Defendants to keep such animals in an appropriate state of balance in properly designated HMAs, allowing them to spread to other areas including, but not limited to areas which have no water resources at all.

(c)     These failures have, in turn, have caused physical and biological environmental conditions which have seriously damaged, reduced and, in some cases, eliminated water availability for irrigation, domestic, and stockwatering purposes.  They have also damaged and, in some cases, virtually destroyed, and other agricultural land resources, such as forage, and have decreased biological diversity.   Water and forage rights in the State of Nevada are property interests belonging to members of the NFBF and which are subject to constitutional and other legal protections.  The improper actions and failures to act of Defendants, by interfering with these rights, have adversely impacted the constitutionally protected rights of NFBF members in their water and forage rights, an area of concern for the NFBF.  In several cases, at least, Defendants have affirmatively denied NFBF members access to their rights to water in sources located on federally-owned or managed land in violation of their rights to access

and use such waters based on an improper application of the Act and/or a failure to comply with the mandatory duties imposed by the Act as further alleged herein below.

(d)      Members of the NFBF and the Nevada agricultural community at large also have interests in Defendants' compliance with statutory mandates as the failure to do so have resulted in an increase in wildfires and the risk of wildfires as well as rangeland degradation, reductions in vegetation and other species, and safety hazards occasioned by the actions and inactions of Defendants described herein, all of which decrease or even – in some cases – eliminate the agricultural viability of not only the federal lands in Nevada, but also adjacent, privately-owned agricultural lands.  Their livelihoods, personal health and safety, personal and real property, and personal and emotional investment in their communities have been adversely affected by the conduct of Defendants at issue herein and the unhealthy and unsafe conditions and will continue to be so affected absent relief granted by this Court.  NFBF and its members are therefore aggrieved parties within the meaning of the APA, *supra*..

B.    **DEFENDANTS**

11.    Defendant Department of the Interior ("the Department") is a Department of the United States which is tasked by the Act with the enforcement of the Act on those lands under its management and has overall authority within the Executive Branch over implementation of the Act and management of the free-roaming horses and burros

which are the object of the Act and are located on lands managed by the Department.  It is bound by the mandatory duties and overall responsibilities delegated in the Act.

12.    Defendant, the Honorable Sally Jewell, is the current Secretary of the Interior.  She has the overall responsibility within the Department of the Interior for making determinations required by the Act and for ensuring the proper carrying-out of the mandatory duties and other responsibilities created by the Act as well as delegating her authority to subordinate officers, employees, and agents of the Department, as will her successors-in-office.  She also has the overall responsibility for supervising the officers, employees, and agents of the Department and, among other things, establishes and supervises policies and procedures pertaining to enforcement of the Act and implementation of its dictates.  She, and her predecessors in office prior to her assumption of the Office, acted at all times relevant hereto as Secretary of the Interior and is sued in her official capacity.  Both Secretary Jewell and her predecessors improperly acted, unlawful failed to act, and improperly delayed actions as alleged herein below.

13.    Defendant BUREAU OF LAND MANAGEMENT ("BLM") is the Agency within Defendant Department which has been delegated the authority to carry out the implementation of the Act and makes the day-to-day decisions pertaining to the implementation of the Act including, but not limited to, management of free-roaming horses and burros, designating Herd Management Areas, establishing Appropriate Management Levels, carrying out so-called horse gathers, conducting horse and burro adoption proceedings, conducting sales of animals, enforcing its provisions against alleged violators of the Act's prohibitions, and numerous other activities.  Within the

COMPLAINT: Page 14 of  50

BLM, deputy directors are assigned responsibility for overseeing a number of specific program areas within the BLM including, but not limited to, the Wild and Free-Roaming Burro program.  Beneath the Deputy Directors are Assistant Directors among who the management functions of the Director and the Deputy Directors are delegated for day-to-day oversight, *inter alia*.  Subsequently, the BLM is divided into State Offices, each headed by a State Director, and specific activities pertaining to the enforcement of the Act, management of horse and burro populations and individual animals are carried out by the respective State Office directors, employees, and agents.  Each higher officer has responsibility for overseeing and directing those beneath them within the BLM.

14.     Defendant Neil Kornze is the Principal Deputy Director to whom authority over the implementation of the free-roaming horse and burro program was delegated. He is responsible for ensuring the proper implementation and enforcement of the Act, subject to the authority and supervision of the officers above him.  He and his predecessors in office prior to his assumption of the Office, acted at all times relevant hereto as Principal Deputy Director of the BLM with responsibility for the horse and burro program and he is sued in his official capacity.

15.     Defendant Edwin Roberson, Assistant Director for Renewable Resources and Planning, and is responsible for overseeing and directing the officers and employees below him.  Both he and his predecessor in office in turn have acted at all times relevant hereto as Assistant Director for Renewable Resources and Planning and is sued in his official capacity.  He, as did his predecessor, exercises oversight and supervisory authority for issues regarding compliance with and implementation of the free-roaming horse and burro program nationwide and actions taken or not taken in

compliance therewith, including the specific actions, delayed actions, and inactions challenged herein.

16.     Defendant Amy Leuders is State Director for the Nevada State Office of the Bureau of Land Management and is sued in her official capacity. Defendant Leuders, together with her predecessors in office, have acted at all times relevant hereto, under the authority delegated to here office and has the overall responsibility for the enforcement and implementation of the Act within the boundaries of the State of Nevada and the specific actions, delayed actions, and inactions challenged herein.

17.     Defendants Does 1-50 are employees or agents of the United States, the United States Department of the Interior, and/or the BLM or other persons who participated in the events alleged herein in their official capacities or individual capacities.   Their names and specific roles are currently unknown, but will be added to the complaint in further detail as their identities and roles are more specifically identified and alleged.

## IV.

## STATEMENT OF FACTS

18.     At issue herein is the compliance of Defendants with the Wild Free-Roaming Wild Horse and Burro Act of 1971 as Amended (16 U.S.C. § § 1331, *et seq.*) ("the Act") and the regulations promulgated by Defendants herein as well as their actions, failures to act, and unreasonable delays in acting.

## A.     STATUTORY PROVISIONS AT ISSUE

**The Administrative Procedure Act ("APA")**

19.     The APA requires federal agencies to conduct their business in the open in such a manner as to ensure that the public is fully informed as to the regulations and decisions by said agencies and departments; that there is an orderly process for the promulgation and publication of rules, decisions, and adjudications which protect the decision-making process against arbitrariness and bias; and the like.  5 U.S.C. §§ 551-559. Similarly, the APA ensures a right of judicial review of agency actions for those persons "aggrieved" those actions.  5 U.S.C. §§701-706.  Specifically, a person aggrieved by agency action may submit the matter to a reviewing court which must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.  Such review is available to both compel agency action unlawfully withheld or unreasonably delayed and to set aside agency actions, findings and conclusions if they are: (a)  arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (b)  unconstitutional; (c)  in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (d) were taken without compliance with procedure; (e) are unsupported by substantial evidence; or (f) were unwarranted by the facts (where the facts are subject to de novo review).  Agency conduct which involves or implicates any and/or all of the statutes and regulations at issue herein is reviewable under the APA and may be reviewable under other provisions of law.

**The Wild and Free-Roaming Horses and Burros Act of 1971 (as amended) ("WFRHBA" or "the Act")**

20.     A copy of the text of the Act (16 U.S.C. § § 1331, *et seq.*) is appended

hereto in its entirety as Exhibit 1 and is incorporated herein by reference as though fully

set forth herein.  Of particular concern in this case are the provisions set forth *infra*:

21.     Mandatory Duties of the Secretary Under The Act:  In 1971, Congress

established a policy in the WFRHBA to protect "wild free-roaming horses and burros . . .

from capture, branding, harassment, or death."  16 U.S.C. § 1331.  Congress did not,

however, determine that such animals to be everywhere considered appropriate to exist

or to be placed or protected.  Instead, they were to be considered as "an integral part of

the natural system of the public lands" [only] in the area where presently found (i.e., in

1971, the year the Act was passed into law).  *Id.*  Likewise, Congress recognized that

there could be, indeed, must be protection only within certain limits.  Absent such limits,

severe damage could occur, affecting not only the quality of the lands on which such

animals are found, but also to private property rights; wildlife, livestock, and other

animals; and the horses and burros themselves; among other things.   Given the

propensity of such horses and burros to breed in an uncontrollable fashion as they have

virtually no natural predators (such animals can easily double in population every four

years) Congress imposed a number of mandatory duties on the Secretaries of

Agriculture and Interior.

(a)     For example, the Act provides that the Secretaries:

*shall* manage wild free-roaming horses and burros in a
manner that is designed to achieve and maintain a thriving
natural ecological balance on the public lands . . .

*shall* consider the recommendations of qualified scientists in the
field of biology and ecology, some of whom shall be independent of
both Federal and State agencies and may include members of the
Advisory Board established in section 7 of this Act . . .

COMPLAINT: Page 18 of  50

shall [carry out management activities] at the minimal feasible level
. . .

shall [carry out all management activities] . . . in consultation with
the wildlife agency of the State wherein such lands are located in
order to protect the natural ecological balance of all wildlife species
which inhabit such lands, particularly endangered wildlife species . .
.

*shall* [in making any adjustments in forage allocations on any such
lands] take into consideration the needs of other wildlife species
which inhabit such lands . . .

*shall* maintain a current inventory of wild free-roaming
horses and burros on given areas of the public lands. The
purpose of such inventory shall be to: make determinations
as to whether and where an overpopulation exists and
whether action should be taken to remove excess animals;
determine appropriate management levels of wild
free-roaming horses and burros on these areas of the public
lands; and determine whether appropriate management
levels should be achieved by the removal or destruction of
excess animals, or other options (such as sterilization, or
natural controls on population levels) . . .

*shall* [in making such determinations] consult with the United States
Fish and Wildlife Service, wildlife agencies of the State or States
wherein wild free-roaming horses and burros are located, such
individuals independent of Federal and State government as have
been recommended by the National Academy of Sciences, and
such other individuals whom he determines have scientific
expertise and special knowledge of wild horse and burro protection,
wild-life management and animal husbandry as related to
rangeland management.

16 U.S.C. § 1333(a)(1).  Emphasis added.

(b)      Furthermore, the Secretaries of Interior and Agriculture in their

respective spheres are mandated to keep close scrutiny of the numbers of

such animals and take action to immediately remove "excess animals"

from the range and to "protect the range from the deterioration associated

with overpopulation." 16 U.S.C. § 1333(a)(2).

22.     Unlike many other federal land management statutes which vest the

Secretaries with broad discretion, the Act strictly limits the discretion of the respective

Secretaries with respect to how they are to carry out these tasks under the Act.  In fact,

in key areas they are given virtually no discretion.  Instead, Congress directed that

"[s]uch action shall be taken, *in the following order and priority*, until all excess animals

have been removed so as to restore a thriving natural ecological balance to the range,

and protect the range from the deterioration associated with overpopulation".  *Id.*

Emphasis added.  (The term "thriving ecological balance and multiple-use relationship"

is not defined in the Act.  The BLM's Wild Horses and Burros Management Handbook (

H-4700-1) (which is not law) does not define the phrase either.)  Specifically, the Act

provides that the following procedures must be followed in the following order:

(a)     The Secretary *shall* order old, sick, or lame animals to be destroyed
in the most humane manner possible;

(b)     The Secretary *shall* cause such number of additional excess wild
free-roaming horses and burros to be humanely captured and removed for
private maintenance and care for which he determines an adoption
demand exists by qualified individuals, and for which he determines he
can assure humane treatment and care (including proper transportation,
feeding, and handling): Provided, That, not more than four animals may be
adopted per year by any individual unless the Secretary determines in
writing that such individual is capable of humanely caring for more than
four animals, including the transportation of such animals by the adopting
party; and

(c)     The Secretary *shall* cause additional excess wild free roaming
horses and burros for which an adoption demand by qualified individuals
does not exist to be destroyed in the most humane and cost efficient
manner possible.

16 U.S.C. § 1333(a)(2).  Emphasis added.  In short, the WFRHBA imposes mandatory,

non-discretionary duties on the Secretaries.  Nothing in the Act imposes a preference

for horse and burros over livestock or wildlife (properly called – though the Act refers to

"wild, free-roaming horses and burros", it quite properly does not refer to them as

"wildlife", they are simply as the Act defines them, unbranded and unclaimed horses,

*i.e.*, they are feral animals and notwithin the accepted definition of wildlife) and, further,

nothing in the Act allows for the expansion of horse and burro populations into areas

other than those in which they were found in 1971.

    23.    The Act also imposes a mandatory duty on the Secretaries to sell by any

means (including but not limited to auction) "[a]ny excess animal or the remains of an

excess animal . . . if" the animal is more than 10 years old or "it has been offered

unsuccessfully for adoption at least 3 times" until they have *all been sold* or the

appropriate management levels has been obtained "in *all areas* occupied by wild free-

roaming horses and burros." 16 U.S.C. § 1333(2)(e).  Emphasis added.  If it cannot be

sold or adopted, it must be destroyed as set forth above.

    24.    This provision in paragraph 24 *supra* is subsidiary to the obligation of the

Secretaries to remove the animals from the public lands.  The adoption and auction

provisions of the Act as well as its provision, cited above, requiring the destruction of

excess animals, concern themselves with what must be done with excess horses and

burros *after* they have been removed from the public lands.  They reinforce Congress'

intention that excess animals are not to be removed from the lands only to be stockpiled

in enclosures or similar areas indefinitely as is defendant BLM's current practice.  *See*

further allegations, *infra*.  They must be sold, adopted, or destroyed with reasonable

promptness and cannot be left on or released to public lands unless and until AMLs are

achieved and maintained *everywhere* on public land where they existed prior to the

enactment of the WFRHBA.

25.    Similarly, nothing in the Act permits either the BLM or the Forest Service

to utilize private property – including water rights owned by third parties wherever

located – to carry out the Act's purposes absent the consent of, and agreements with,

the owners of such property.  *See, e.g.*, 16 U.S.C. § 1334.

> If wild free-roaming horses or burros stray from public lands onto privately
> owned land, the owners of such land may inform the nearest Federal
> Marshall or agent of the Secretary, who shall arrange to have the animals
> removed. In no event shall such wild free-roaming horses and burros be
> destroyed except by the agents of the Secretary. Nothing in this section
> shall be construed to prohibit a private landowner from maintaining wild
> free-roaming horses or burros on his private lands, or lands leased from
> the Government, if he does so in a manner that protects them from
> harassment, and if the animals were not willfully removed or enticed from
> the public lands. Any individuals who maintain such wild free-roaming
> horses and burros on their private lands or lands leased from the
> Government shall notify the appropriate agent of the Secretary and supply
> him with a reasonable approximation of the number of animals so
> maintained.

Indeed, the BLM may be compelled by a court to remove wild horses and burros from

private land, including water sources in which the private party owns water rights where

ever the sources are located, if it fails to do so when requested as provided in § 1334.

See, e.g., *Fallini v. Hodel*, 783 F.3d 1343 (1986).

26.    The mandatory provisions of the Act require strict compliance by the

Defendants both because they are mandatory and because the failure to do so

necessarily will result in Congress's intent being thwarted..

27.    Implementation of the Act requires Defendants to undertake certain action,

including – *inter alia* -- those specified in the mandatory provisions of the Act described

*supra*.  For example, Defendants and their predecessors in office need(ed) to, among other things:

(a)     to determine the population of protected animals; that is, to conduct an inventory and to and maintain that inventory over time;

(b)     identify the areas in such areas they existed at the time of the enactment of the WFRHBA within their respective states;

(c)     understand the ecological and environmental circumstances of said areas including, but not limited to, vegetation, water availability (including ownership of the rights to such water), existence and makeup of wildlife in said areas as well as account for multiple use needs of such areas;

(d)     consult with and work with a variety of third parties including, but not limited to, State wildlife officials and other experts on horses and burros, wildlife management, animal husbandry, and other areas of knowledge and expertise;

(e)     based on the above-information, calculate AMLs;

(f)     monitor horse and burro populations;

(g)     take action to remove such animals from the public lands as are required to immediately remove "excess animals" from the range and to "protect the range from the deterioration associated with overpopulation." 16 U.S.C. § 1333(a)(2); and

(h)     take actions with respect to excess, old and diseased animals as directed by 6 U.S.C. § 13333(a)(2).

Defendants' Department of the Interior's and BLM's regulations adopted to implement

the Act are consistent with the provisions of the Act but are largely ignored in practice in the manner alleged herein below.

28.     Nothing in the WFRHBA or 43 CFR Part 4700 contemplates or authorizes Defendants to create and maintain a "warehouse" of wild horses and burros such as this by placing and storing them in corrals or enclosed pastures for an indefinite period.  In fact, such actions violate the specific provisions of the Act, as set forth above, which dictate exactly what actions must be taken by Defendants and in what order.  The Act clearly expresses an intent to maintain a limited population of such animals on so-called "public lands" and only on such public lands where the animals existed as of 1971 to preserve what is perceived to be an historic situation with respect to such animals.

29.     Congress deemed the above-provisions necessary both for the protection and preservation of the free-roaming horses and burros themselves and to ensure the environment in which the horses and burros are managed is protected, that biological diversity is maintained, that the multiple use principle is maintained and protected . . .

**B.     FAILURE OF THE BLM TO COMPLY WITH THE PROVISIONS OF THE ACT.**

30.     Plaintiffs hereby reallege and incorporate by reference herein paragraphs 1-30, *supra*, as though fully set forth.

31.     Defendants are not complying with the manoatory requirements of the Act. Instead, they have, *inter alia*, allowed populations to rise, have been dilatory at removing and disposing – or allowing the adoption and/or sale of – excess horses and burros even when ordered to do so by courts, and have been dilatory in removing horses from private lands when requested to do so.  On occasion, as the *Fallini* case demonstrated cited above, the BLM has refused to remove horses from private lands

when requested to do so, requiring the intervention of a court to force compliance.

While Defendants often cite insufficient funds to carry out their obligation to remove

excess horses and to carry out other mandatory duties under the Act, such shortages of

funds as exist are actually a result of the failures to act and other failures to comply with

the Act, alleged in more detail *infra*, that is consuming Defendants budgetary resources.

> (a)      For example, as the AAS Report states: "[M]aintaining a herd within
>
> an AML [Appropriate Management Level] requires removing animals in
>
> roundups, also known as gathers.  Adoption demand does not balance the
>
> number of animals removed and there is no political support for culling
>
> unadopted animals.  Therefore, BLM pays for animals removed from the
>
> range to live in long-term holding pastures for the remainder of their lives.
>
> At the time the committee's report was prepared, long-term holding
>
> consumed about half of the Wild Horse and Burro Programs' budget."
>
> *Id.* at 1-2.

**Failure to Conduct and Maintain an Accurate, Scientifically-Based
Inventory of Wild Horses and Burros and to Utilize Scientific
Information in Free Roaming Horse and Burro Management as
Required by the Act**

32.      A proper, scientifically-valid, population inventory is required by the Act

and is essential to maintaining a "thriving, ecological balance and multiple use

relationship" as mandated by the statute, and to prevent damaging overpopulation by

horses and burros.  Absent such an inventory, Defendants cannot comply with these

and other mandates of the Act and cannot achieve the purpose of the Act.

Nevertheless, Defendants have utterly failed to properly maintain and update such an

inventory although it has a mandatory duty to do so under the Act.

33.     In June of 2012, the national population of free-roaming wild horses and burros managed by Defendants was estimated by BLM to be 37,300, not including animals managed by the United States Forest Service of the Department of Agriculture. This figure also improperly excludes those horses and animals removed from the open range by Defendants and kept in corrals and enclosures as alleged in more detail *infra*. Assuming the correctness of the BLM's figures – contrary to the GAO, AAS and similar reports alleged herein – Plaintiffs allege herein on information and belief, that more than 45,000 additional such horses and burros are being maintained long term pastures and short term corrals by the BLM at considerable public expense.

34.     Defendant BLM's estimate is low and not science based.  The American Academy of Sciences determined in 2013 that Defendants have not and are not employing scientifically-valid methodologies to make their estimates or to make an actual, accurate inventory, erring on the side of grossly undercounting horses.  *Using Science to Improve the Wild Horse and Burro Program: A Way Forward*, Committee to Review the Bureau of Land Management Wild Horse and Burro Management Program; Board on Agriculture and Natural Resources; Division on Earth and Life Studies; National Research Council, National Academies Press (2013).  (Hereinafter "AAS Report".)

35.     Among the AAS Report's "key findings" is the conclusion that Defendant BLM's "management of free-ranging horses and burros is not based on rigorous population monitoring procedures." *Id.* at 3.  It likewise found that existing statistics on national population size cannot be considered scientifically rigorous based on the

inadequacies of the information supplied by BLM. *Id.* At 5.

36.    The conclusions of the AAS Report, however, reinforce the information already known to Defendants.  The Office of the Inspector General of the Department of the Interior ("OIG") independently found that BLM's estimates are low well before the AAS report was published.  It cited a 2008 GAO report (Audit Report No. GAO-09-77. "Bureau of Land Management: Effective Long-Term Options Needed to Manage Unadoptable Wild Horses," October 9, 2008") for this conclusion, showing that this undercounting has been going on for a minimum of more than 5 years, and probably for the duration of the Act's existence, and shows no indication that Defendants intend to bring their actions into compliance with the statute.

### Failure to Maintain Wild Horses and Burros in a "Thriving Ecological Balance and Multiple-use Relationship"

37.    Plaintiffs hereby reallege and incorporate by reference herein paragraphs 1-5, 9-19, 21-30, 32-37 *supra* as though fully set forth.

38.    The WFRHBA specifies that the population of wild, free-roaming horses and burros be kept in an ecological balance and multiple-use relationship.  To do this, defendants have, among other things, established herd management areas or "HMAs" and have determined Appropriate Management Levels or "AMLs".  By definition, a properly and accurately established AML is the number above which a "thriving ecological balance" and a multiple-use relationship cannot be maintained for reasons set forth in more detail in paragraphs below.

39.    AMLs must be properly maintained and the methods by which this is to be done once the number of animals exceed AMLs, and the order in which these must be

applied when AMLs are exceeded are mandated by the Act as set forth in paragraphs 22-30 *supra*. The AMLs established by Defendants are themselves are arbitrary and capricious. The American Academy of Science Report cited here made a specific finding that "[h]ow AMLs are established, monitored, and adjusted is not transparent to stakeholders, supported by scientific information, or amenable to adaptation with new information and environmental and social change." AAS Report at 11.

    (a)    In 16 U.S.C. § 1333(b)(1), the mandated inventory is described as having as one of its purposes a study to "determine whether appropriate management levels should be achieved by the removal or destruction  of excess animals, or other options (such as sterilization, or natural controls on population levels). The Act, however, specifically then provides that excess animals must be removed and other acts prescribed must be used in the order prescribed once AMLs are exceeded. Other methods mentioned in the Act, such as sterilization, appear to be able to be used to keep numbers from increasing beyond AMLs in the first instance rather than as a remedy once the prescribed thriving ecological balance is lost.

    40.    The OIG's report itself underscores the importance of removing such animals from the range and indicates, based on a previous report by the American Academy of Science's National Research Counsel, that the failure of Defendants to maintain an accurate inventory and to take appropriate steps to reduce and keep populations to or below AML (which can only happen *if* Defendants comply with their mandatory duties) can lead to serious problems totally at odds with the Act's purposes.

    According to a 1982 report by the National Research Council, without

external intervention wild horse and burro populations will grow beyond the point at which environmental damage occurs, to the detriment of other authorized uses. Range resources will be exhausted and/or damaged as the wild horse and burro herds increase in size. BLM's present day wild horse population models estimate that herds will increase by approximately 20 percent annually under normal conditions, and at this rate, herd sizes double every 4 years. The graph below estimates population growth from 38,365 in 2010 to 238,000 by 2020 on public land if there were no efforts toward population control.

*Id.* at 9.  Graph omitted.

41.     Further, the OIG Report found that by 1990, thirteen years ago, that the number of wild horses already exceeded AMLs, that BLM had not aggressively pursued other alternatives to removing and/or destroying animals, and that BLM was not monitoring and/or evaluating the health of the herds. GAO Audit Report No. RCED-90-110 *Range Management, Improvements Needed in Federal Wild Horse Program,* August 1990.  GAO found that improvements were needed in program management as BLM could not determine how many horses Federal rangelands could support, the extent of degradation they caused, and the number of horses that should be removed from herd areas; and that *despite congressional direction*, BLM did not base its removal of wild horses on how many horses the Federal rangeland could support.

42.     The same problem in compliance noted as a national problem by the OIG occurs specifically in Nevada.  Roughly half of these animals (approximately 46 percent) are located in the State of Nevada.  Employing BLM's numbers, and not including those kept in corrals and enclosed pastures, there were over 11,000 excess horses and burros as defined by the Act in 2012, over at least 5,060 of which were in Nevada, imposing a disproportionate share of the ecological, economic, and other impacts of

excess populations on Nevada's resources.  The next closest state, California, had only

26 percent of the horse and burro population without the remaining 24 percent was

scattered over 8 other states in insignificant percentages (averaging 3 percent per

state).  If the corralled and pastured numbers are included, there are over 56,000 wild

free-roaming horses and burros as defined by the Act nationwide of which roughly

25,760 are in Nevada.

       (a)    As alleged in more detail *infra,* while the corralled and pastured

animals are not currently located on open range, they not only qualify

legally as excess populations under the Act which have not been adopted

out, sold, or disposed of pursuant to the Act's mandates, the resources

expended on keeping such animals in violation of the Act is a factor

affecting Defendants' obligations to conduct gathers, for example, further

compounding Defendants' failure to comply with the Act's mandatory

provisions.

    43.    Even using the BLM's known-to-be erroneously low population estimate

nationwide of 37,300 in June 2012 (*see* paragraph 34 *supra*) as the *minimum* number of

excess horses and burros and the fact that approximately 46 percent of that estimated

population was located in Nevada, one can calculate the present excess horse and

burro population in Nevada.  Accepting BLM's estimated population increase rate of 20

percent *per annum* for the animals means that by the time of the drafting of this

Complaint, given the failure of Defendants to conduct gathers are required by the Act,

the *minimum* probable excess population of horses in at this time Nevada is 6,072.  By

the same time next year, given the same assumption, the excess population in Nevada

will be 7,286.  Ten years from the year of the drafting of this Complaint, using Defendants' own assumptions, without compliance with the Act, including corrective action for past failures, the excess horse and burro population in Nevada will reach more than 45,112 animals, not including pastured and corralled horses and assuming that this number is not reduced by starvation and illness among the population resulting from the resulting overpopulation.  These figures, however, are based on Defendants' 2012 estimates which are known to be faulty.  The actual number is likely much higher.

44.     Excess populations of HMAs in Nevada are numerous as are Defendants' failures to take proper action to reduce the populations.  Instead, BLM is violating multiple use principles, which the Act specifically requires BLM to preserve and maintain, by refusing to reduce excess populations while requiring ranchers, other agricultural interests, and other users of the lands to stop their uses to protect excess horse populations.  As just one example, BLM is demanding that all livestock be removed from specified allotments in an area known as the Diamond Complex in Nevada and further removal orders elsewhere in the Diamond Complex are expected as are also expected elsewhere in the State, purportedly because of drought conditions. At the same time, BLM is making no apparent effort to remove even as many horses and burros as are necessary to bring their numbers down to appropriate management levels ("AML").  On the allotments in question, the horse and burro population exceeds AML by more than 1,200 percent and exceeds AML on the entire complex by at least 393 percent.  These same actions are occurring throughout Nevada including Lincoln County, Nevada, among other places.

45.     Such actions and failures to act by Defendants violate not only the

mandatory provisions of the Act to remove horses and burros and to take other measures to reduce populations to AMLs, they are arbitrary and capricious and violate the Act's mandate that multiple use principles be honored.  Under these circumstances, requiring the owners of livestock who own stockwater rights on the range to entirely remove their livestock will have no measurable result in improving rangeland health based simply on the current wild horse numbers, but it will impose significant damage on them.  The failure of BLM to keep these horses and burros at appropriate management levels is sufficient to, in a single year, destroy years of progress in improving and/or maintaining rangeland health through the efforts of livestock owners and the BLM while allowing the horse and burro populations to grow still larger above AMLs by removing other forage and water users who have legally protected property interests in the waters.

### Defendants Publicly Admit to these and Other Violations of the Act Including But Not Limited to Refusing to Sell Excess Animals as Required by the Act

46.     Plaintiffs hereby reallege and incorporate by reference herein paragraphs 1-5, 9-19, 21-30, 32-37, and 39-46 as though fully  set forth.

47.     On November 5, 2013, Defendant BLM updated its page on its internet website (www.blm.gov/wo/st/en/prog/whbprogram/history_and_facts/myths_and_facts/). (Exhibit 2 hereto) which is incorporated herein by reference as though fully set forth. (Hereinafter "Myths and Facts").

48.     Myths and Facts lists a number of characterizations of BLM's actions and policies that it refers to as "myths" and provides for each characterization a paragraph of "facts" to refute the characterizations.  In this effort, Defendant BLM explicitly admits to

violations of its statutory mandates and makes it clear that some, if not all, of its

violations were intentional to avoid offending certain constituencies.

49.     For example, Myths and Facts responds to one "myth", *i.e.,* that "[t]he

BLM is selling or sending wild horses to slaughter" as follows:

> Fact: This charge is absolutely false. The Department of the Interior and
> the Bureau of Land Management care deeply about the well-being of wild
> horses, both on and off the range, and [therefore] the BLM does not and
> has not sold or sent horses or burros to slaughter. Consequently, as the
> Government Accountability Office noted in a report issued in October
> 2008, the BLM is not in compliance with a December 2004 amendment
> (the so-called Burns Amendment to the 1971 Wild Free-Roaming Horses
> and Burros Act) that directs the Bureau to sell excess horses or burros
> "without limitation" to any willing buyer.

Exhibit 2.  In short, Defendants Department of the Interior and BLM admit openly that

they are failing to comply with congressional mandates based on their deep feelings for

the "well-being of wild horses both on and off the range."

50.     In response to "myth 3" Defendant BLM admits to stockpiling excess

animals in pens and enclosed pastures.  In response to "myth 5" Defendants admit to at

least 14,000 animals on the range above AMLs (as previously alleged, a known

underestimate).  In response to "myth 10", Defendants admit that it has historically

undercounted horses but claims it will fix this undercounting by another method.  This

method, however, is no more scientifically based than its current methods.  Exhibit 2.

51.     On September 18, 2012, Plaintiff NACO sent a letter to then Secretary of

Interior Kenneth Salazar (appended hereto as Exhibit 3 and incorporated herein by

reference as though fully set forth) bringing to Secretary Salazar's attention the

continuing problems, failures to act, inappropriate actions, and delays to act of

Defendants and their predecessors with respect to the Act. The purpose of the letter, in the absence of any mandated, specific, or otherwise available administrative procedures which Plaintiffs could follow to obtain relief from Defendants failures to comply with the provisions of the Act, was to bring to the Secretary's attention, consistent with 16 U.S.C. § 1333(a)(2)(iv) information regarding population of horses within Nevada as well as other problems and deficiencies in Defendants' compliance with the Act.

52.     Secretary Salazar did not respond to this letter for an extended period of time. Therefore, NACO, on or about January 22, 2013, sent a second letter to Secretary Salazar on or about January 22, 2013 (a copy of which is appended hereto as Exhibit 4 and incorporated herein by reference as though fully set forth) again "strongly urg[ing] [his] office to take steps to bring the BLM into compliance with the provisions of the WFRHBA" (Exhibit 4 at 1) and noting that "[n]o administrative process has been provided by Interior for ensuring compliance with the Act by the agency" and that "[t]here is no application or appeal process mandated by law, or even available, for NACO or any party to use to restore or ensure compliance with the Act by the BLM or the Forest Service." *Id.* NACO reminded him that "time was of the essence in obtaining a remedy because any significant delay in correcting the situation means an even greater delay in repairing current and future damage from the failure to comply to date in into the future." *Id.* Copies of each letter were also sent to Mr. Mark Pool, the then Acting Director for BLM, and Defendant Edwin Roberson. The second letter requested a response within 10 days of the date of the letter.

53.     No answer was forthcoming to either letter until a letter dated April 23,

2013 signed by Defendant Roberson was received.  This letter is appended hereto as

Exhibit 5 and is incorporated herein by reference as though fully set forth.  The

Roberson correspondence failed to directly confront the information provided to the

Secretary, gave assurances of progress that conflicted with information on the ground

that showed that there was not only no progress, but that Defendants' compliance with

the Act was increasingly poor.  Indeed, the correspondence acknowledged, among

other things that BLM's population "estimates were low", that over an eleven year period

"adoptions had declined from 7,600 in 2001 to 2,700 in 2012", that "holding costs for

captive horses have increased dramatically", and that "nearly 50,000 unadopted

animals are currently housed in long-term holding facilities." *Id.* at 2.  Mr. Roberson's

letter invited NACO to meet with "BLM's senior leadership to collaborate on viable

program solutions" that would meet NACO's concerns."  Exhibit 5 at 2.

54.    On or about July 8, 2013, NACO responded to Defendant Roberson's

invitation by correspondence (appended hereto as Exhibit 6 and incorporated by

reference herein as though fully set forth), accepting his invitation and suggesting that a

meeting occur within 30 days if practicable to at least determine whether such a solution

was feasible.  NACO has never received a response to this correspondence as of the

date of this Complaint.

**Injury and Adverse Consequences of Defendants' Failures to Comply
with The Act**

55.    Plaintiffs hereby reallege and incorporate by reference herein paragraphs

1-5, 9-19, 21-30, 32-37, 39-55 as though fully set forth.

56.    The WFRHBA, as alleged herein above, is intended to protect unbranded

and unclaimed horses and burros against "capture, branding, harassment, or death" (16 U.S.C. § 1331), not because they constitute an endangered species or similar organism, but because "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene." *Id.* At the same time, as already alleged above, the Act places limitations on the degree and type of protection available under its provisions, establishes the areas in which they are to be "considered a part of the natural system of the public lands" on in the areas where they were found in 1971 (16 U.S.C. § 1331), provides for the protection of the environment from excess populations, provides for continuation and protection of the multiple use of "public lands" affected by horses, and established in the Act specific and mandatory procedures as to how to deal with horse and burro populations. Likewise, Congress recognized that there could be, indeed, must be protection only within certain limits. Absent such limits and mandatory procedures, severe damage could occur, affecting not only the quality of the lands on which such animals are found, but also to private property rights; wildlife, livestock, and other animals; and the horses and burros themselves; among other things.

57. Defendants are seeking methods of controlling populations without removing excess animals from the range. Among these are attempts at using birth control by administering chemical agents to some of the horse and burro population with the apparent aim of keeping the population within established AMLs. However, the Act itself mandates the means by which such population control is to be accomplished, at

least until such alternative measures are found and determined to be effective and the

Congress amends the statute.  The Inspector General's report itself underscores the

importance of removing such animals from the range.

> According to a 1982 report by the National Research Council, without
> external intervention wild horse and burro populations will grow beyond
> the point at which environmental damage occurs, to the detriment of other
> authorized uses. Range resources will be exhausted and/or damaged as
> the wild horse and burro herds increase in size. BLM's present day wild
> horse population models estimate that herds will increase by
> approximately 20 percent annually under normal conditions, and at this
> rate, herd sizes double every 4 years. The graph below estimates
> population growth from 38,365 in 2010 to 238,000 by 2020 on public land
> if there were no efforts toward population control.

OIG Report at 9.  Graph omitted.

58.    The failure to keep the horse and burro populations within the established

appropriate management levels by consistently and properly removing excess animals

both in and outside established HMAs create hazards and affect the environmental

quality, economic interests, and public health and safety interests of the counties and

communities in Nevada and their residents as well and the health and well-being of the

animals themselves.

59.    The failure of Defendants to keep the animals in the ecological balance

and multiple use relationship demanded by the Act, at least in Nevada, has caused the

deterioration of all of the above conditions within Nevada.  A lack of strict compliance

with the Act for even a single year compounds the problem, due in large part to the

proclivity of the subject populations to reproduce rapidly combined with the lack of

natural predators.  Using the BLM's own figures, allowing herds to grow unchecked for

even one year makes it harder to achieve compliance in the following years because

increases in the size of the herd makes it more costly and more time consuming to "make up" for the lost management opportunity in each succeeding year. Over time, the problem becomes not arithmetically increased, but geometrically increased.

60.    The increase in difficulty in "making up" for prior years' failures to "gather" excess animals is further exacerbated by Defendants' willful failure to sell or destroy animals because of their "car[ing] deeply" for horses and burros both on and off the range as alleged above because their only alternative, not authorized by the Act, is to warehouse and maintain the gathered animals in short-term corrals and long-term enclosed pastures for the remainder of their natural life spans which, in the case of a the horse that is well maintained and stays in hygienic conditions, is expected to be between 25 to 30 years. Maintenance of captive horses, in the instant case – according to Defendant Roberson's correspondence to NACO – approximately 50,000 animals (Exhibit 5 at 2), is a very expensive proposition.  At the time of the drafting of the AAS Report *supra*, approximately half of BLM's current Horse and Burro budget is consumed by the maintenance of these horses, a figure which can only rise if horses and burros removed in the future are added to the animal warehouse.

61.    Defendants most frequently cite lack of funds as the basis for its failures to remove excess horses and burros.  Given the facts alleged in paragraph 61 *supra*, the lack of funds is a self-inflicted handicap that can be resolved only by stopping the practice of warehousing animals and complying with the mandates of the Act with respect to the adoption, sale, and elimination of excess animals.

62.    Failure to comply damages both the Plaintiffs hereto as well as the lands, wildlife, vegetation, and other resource conditions as well as the people of Nevada.  For

example, horses compete aggressively for natural resources (including forage and water) and can endanger native species, including Lahontan cutthroat trout). Horses trample groundcover, which can impact obligate species such as sage grouse (Jeffress & Roush, 2010). When native vegetation is trampled, cheatgrass is often one of the first vegetation types to grow back. Cheatgrass is a light fuel that ignites easily, which in turn can increase the frequency of wildland fires. This in turn increases costs associated with fighting fire for local and federal responders. Resource Concepts, Inc. estimated in 2001 that economic losses to the livestock sector in the four BLM districts covering Nye County alone, amounted to approximately $6,743,440.  (Nevada Grazing Statistics Report and Economic Analysis for Federal Lands in Nevada. Resource Concepts, Inc.: Carson City, Nevada [2001]).

63.     Horses unquestionably can, and do, pose a threat to public safety by wandering onto roadways and causing auto accidents.  From April 2010 to May 2012, at least 23 such accidents occurred in Nye County, Nevada, alone.  Nye County is sparsely populated.  Other counties are more populated an Nye County and therefore have higher potential for such accidents.  Each such incident must be responded to, and local emergency response costs are borne by the counties or towns in which they occur.

64.     Aside from the economic costs both to the counties and to the individuals involved (in terms of property damage, potentially serious personal injuries, and medical costs), there are other significant human costs involved as well.  The counties have a legal and governmental obligation to address and mitigate such incidents and injuries. As horse and burro populations increase, so too does the likelihood and frequency of

COMPLAINT: Page 39 of  50

such accidents and the costs associated with them – and their prevention.

65.     Feral horses and burros damage the counties in other ways as well.  For example, they compete with domestic livestock, a major source of both primary income and secondary economic activity in the counties of Nevada, The economic impact of the failure of Defendants to comply with the Act's mandates goes beyond the impact on those in the livestock industry, which is significant in itself; it affects the counties themselves.  The primary effects on the economies of the counties include, *inter alia*, the dollars the livestock industry generates from the selling of livestock, and the secondary effects on the economies of the counties that livestock operations have, including, *inter alia*, the creation and maintenance of jobs in Nevada in the various industries and businesses that support the livestock industry (such as veterinary services and supplies, ranching and farming equipment sales and repair, among many others).

66.     Excess animals also substantial and adversely affect other resources and compete for the same resources as wildlife.  They therefore directly and indirectly affect wildlife including both land animals and fish.  Adverse effects on fish and wildlife populations result in adverse effects on the tourism and hunting and fishing industries, also vital components of the economy of Nevada and its counties, all of which the BLM is obligated to consider and protect as are the counties themselves.  *See*, Nevada Revised Statutes ("NRS") 244.387 and 428.0.10.

67.     Many of the resources affected by the horses and burros at issue are private property, the rights to which the United States, the Department of the Interior, and the BLM are constitutionally bound to protect.  Furthermore, under all of the

applicable laws including the WFRHBA and the Taylor Grazing Act, among others, the United States and all of its Departments and agencies, are bound to respect and act within applicable laws of the State of Nevada including, for example, its water laws. Not only are improperly managed horses and burros utilizing waters (the rights to which are owned by third parties) in violation of the water laws of the State of Nevada, such animals are also causing the degradation of water quality and, frequently, have caused the complete loss of spring or seep discharges, among other things.

68.     Plaintiff NACO's members enjoy, support, and have an obligation to protect the lands and resources within the boundaries of Nevada's boundaries.

69.     Defendants' failure and unreasonable delay in complying with the duties imposed on tem by the WFRHBA gravely harms the horses and burros which the Act exists to benefit. The free-roaming horse and burro herds in Nevada are frequently observed to be in malnourished condition, with the ribs and skeletal features of individual animals woefully on view and other signs of ill-health readily observable. In at least one incident, a private party was so shocked by the conditions of horses he observed that he demanded of the local BLM office that they gather those horses together or the individual he would notify media contacts. Only then were the horses in question gathered and removed as required.

70.     The horses and burros which are the subject of the Act are not native to North America or the American West, a fact acknowledged by Defendants. *See* Exhibit 2 at 3. Their populations must be managed and cannot be left to "automatically balance their reproduction rate with rangeland conditions", a fact acknowledged by Defendants. *Id.* at 2. If this is done, as Defendants state, "Mother Nature would regulate the wild

horse and burro population through the classic boom-and-bust cycle, where the population increases dramatically, food becomes scarce, and the population crashes through starvation or dehydration." *Id.* This, however, is exactly what Defendants are doing by their consistent and long-term refusal to comply with the duties and procedures mandated by the Act. As the AAS Report itself noted and Defendants reinforced in the Myths and Facts website, their decisions are improperly influenced by political considerations and their "deep" regard for horses and burros both on and off the range.

71.     As already alleged in detail *supra*, Defendants have been found repeatedly by the Government Accountability Office (GAO), the Interior Department's own Office of Inspector General, and, on at least two occasions, the National Research Council of the AAS, to be failing to comply with the Act's requirement and the Defendant Department of the Interior and BLM have not only acknowledged their failures to do so, they used those failures to defend themselves against criticisms by advocacy groups in its "Myths and Facts" website as late as November 5, 2013. This lengthy pattern and practice of conduct indicates that Defendants will not comply any more in the future than in the past unless compelled to do so.

V.

FIRST CLAIM FOR RELIEF

**(Administrative Procedure Act Claim – Failure to Act and Unreasonable Delay to take action, Arbitrary and Capricious Actions and Determinations, Actions Contrary to Law and Unwarranted by Facts – Violation of WFRHBA)**

72.     Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 72, *supra*, as if fully set forth.

73.     As previously alleged, the Administrative Procedure Act requires federal agencies to conduct their business in the open in such a manner as to ensure that the public is fully informed as to the regulations and decisions by said agencies and departments; that there is an orderly process for the promulgation and publication of rules, decisions, and adjudications which protect the decision-making process against arbitrariness and bias; and the like.  5 U.S.C. §§ 551-559.

74.     Similarly, the APA ensures a right of judicial review of agency actions for those persons "aggrieved" those actions.  5 U.S.C. §§701-706.  Specifically, a person aggrieved by agency action may submit the matter to a reviewing court which must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.

75.     Such review is available to both compel agency action unlawfully withheld or unreasonably delayed and to set aside agency actions, findings and conclusions if they are: (a)  arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (b)  unconstitutional; (c)  in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (d)  were taken without compliance with procedure; (e) are unsupported by substantial evidence; or (f) were unwarranted by the facts (where the facts are subject to de novo review).  Agency conduct which involves or implicates any and/or all of the statutes and regulations at issue herein is reviewable under the APA and may be reviewable under other provisions of law.

76.    The facts alleged herein and incorporated in this Claim for Relief establish that Defendants herein have consistently and knowingly acted, delayed action, and failed to Act in accordance with the mandates and directives of the Act and their own regulations.

77.    The same facts alleged herein and incorporated in the Claim for Relief establish that Defendants acted arbitrarily and capriciously, in an abuse of such limited discretion as the Act permitted, and otherwise were not in accordance with law in that they based their actions and inactions not on the requirements of the Act or their own regulations, but based on political considerations and their own preferences as to what actions should be taken with respect to the animals in question with full knowledge that said actions and failures to act were in violation of the requirements of the Act and their own regulations.

78.    The determinations of Defendants with respect to the conduct of animal inventories, setting of AMLs, determinations of excess populations, determinations of what constitutes as "thriving natural balance", and determinations of when, how many, and whether to gather and remove horses are not scientifically based and the methodologies employed in these determinations were unscientific and without basis in fact and/or contrary to fact and were an abuse of such limited discretion as the Act permitted, and otherwise were not in accordance with law.  In the absence of scientific methodology and scientifically sound evidence on which to base decisions, Defendants actions, delays in action, and failures to act are not supported by substantial evidence and are unwarranted by facts.  In fact, there was, in fact, no real exercise of professional judgment by Defendants.  They ignored their legal requirements and failed

to follow procedure.  Such actions are were taken and decisions made were not based

on professionally accepted scientific bases, standards and practices, but on personal

biases and political considerations

79.    The facts alleged herein also establish that Defendants determination to

warehouse captured animals in short-term corrals and long-term enclosed pastures is in

excess of statutory authority and limitations, and short of statutory right and deprived

them of the resources necessary to follow the Act's mandatory procedures, to gather

excess animals, and the like.

80.    Defendants failed to observe procedures required by law and otherwise

acted in violation of law.  Plaintiffs have and will continue to experience injury as alleged

herein above absent judicial relief.

81.    The facts incorporated into this Claim for Relief also establish that

Defendants violated the Due Process rights of Plaintiffs under the Due Process Claus of

Fifth Amendment to the Constitution in that Defendants failed to follow their own

procedures contained both in the Act and in 43 CFR Part 4700.


VI.

SECOND CLAIM FOR RELIEF

**(Declaratory Judgment Act, 28 U.S.C. § 2201-2202)**

82.    Plaintiffs reallege and incorporate herein by reference the allegations of

paragraphs 1 through 72, and paragraphs 74-82, *supra*, as if fully set forth.

83.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201(a), provides in relevant

part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

84.     Section 2202 of the Act provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

85.     There is a present controversy between and among the parties hereto as to the duties, rights, and obligations of the parties under the WFRHBA which controversy has adversely impacted Plaintiffs hereto and which, if not resolved, will result in further injury.

86.     Pursuant to the Declaratory Judgment Act and the APA as described and alleged herein above, this court has the jurisdiction to enter a declaratory judgment declaring the extent and nature of the duties and obligations of Defendants with respect to management and protection of not only the horses and burros which are the target of the Act, but also the protection afforded the environment, wildlife, multiple use of assertedly public lands and the nature and scope of the mandatory provisions of the Act.. A Declaration by this Court of the rights of the Plaintiffs with respect to the matters raised in this Complaint is necessary to put an end to the continuing conduct of the agents, employees, agencies and Departments of the United States which is intended and/or has the effect of adversely impacting the interests of Plaintiffs as alleged herein

and causing harm to the public interest as well as depriving Plaintiffs of their right to

participate in, and have the Defendants abide by, their own administrative procedures.

VII.

THIRD CLAIM FOR RELIEF

**(Injunction and/or Writ of Mandamus)**

87.     Plaintiffs reallege and incorporate herein by reference the allegations of

paragraphs 1 through 72, 74-82, and 84-86, *supra*, as if fully set forth.

88.     The facts herein alleged and incorporated by reference in this Claim for

Relief establish that Defendants have engaged in a pattern and practice of conduct that

is inconsistent with the requirements of the Act.  They have further established that

Defendants have repeatedly been informed of the problems with its actions and failures

to act, its lack of scientific methodology as well as its repeated violations of statutory

mandates.  The facts alleged and incorporated by reference in the Claim for Relief also

establish that Defendants only comply with statutory mandates sporadically and often

only when compelled by a court to do so, and even then often do not comply with court

orders.

89.     The facts alleged herein and incorporated by reference into this Claim for

Relief also establish that Plaintiffs have been irreparably injured by the failures of

Defendants to establish proper AMLs, to gather excess animals as required, to establish

and maintain accurate animal inventories, to adopt out, sell, or otherwise dispose of

said excess animals in the manner required by law, and to act in a timely fashion as

required by law, *inter alia*, and that absent such relief, the improper conduct alleged will

continue.  In short, Plaintiffs have suffered, and will continue to suffer the substantial

injuries alleged herein as a result of Defendants' conduct absent judicial relief

90.     The facts alleged herein and incorporated by reference into this Claim for Relief also establish that injunctive relief or mandamus is in the public interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

91.     Issue a judgment declaring the duties and responsibilities of Defendants under the WFRHBA and applicable rules, regulations, and directives, the Administrative Procedure Act, and other applicable statutes and regulations.

92.     Issue an injunction and/or Writ of Mandamus requiring Defendants to promptly and fully comply with all the provisions of the Act and specifically to do the following:

(a)     Immediately, upon the filing of the Order, conduct gathers of all excess animals on public lands managed by Defendants in Nevada which exceed the currently established AMLs, both inside and outside of established HMAs.  Given the consistent findings of the OIG, the GAO and the American Academy of Science that current population estimates are significantly lower than actual numbers, such a directive will not result in a removal of too many animals;

(b)     On a continuing basis thereafter, no less frequently than every 2 (two) months, determine the current populations of animals in Nevada and promptly conduct gathers of excess animals on public lands managed by Defendants in Nevada which exceed currently established AMLs;

(c)     Immediately, upon the filing of the Order, cease the long-term

warehousing of animals removed from excess populations of animals on public lands in Nevada and to instead promptly and without delay, proceed to auction, sell and otherwise properly dispose of such animals in accordance with the Act's provisions establishing the actions and their priorities;

(e)     Adhere to multiple use principles in carrying out their responsibilities under the Act n Nevada including, but not limited to, compliance with the laws of the State of Nevada as they pertain to water rights, recognizing that free-roaming horses and burros have no water right in Nevada, unlike indigenous wildlife whose presence pre-dates the acquisition of water rights under Nevada law; and

(f)     Cease interfering with Nevada water rights owned by third parties by preventing their owners access to an use of said waters and to cease favoring horses and burros, particularly excess animals, over other user of the lands including both wildlife and ranchers and other agricultural and multiple users that do not involve actual harassment, branding, or capture and particularly, but not solely, in lands not contained in a properly established HMA.

93.     Establish in the injunction and/or writ of mandamus such other provisions as this Court deems necessary and proper to ensure that Defendants fully comply with the Act's mandates and provisions and further to establish a schedule by which Defendants must accomplish the above-described tasks.  Plaintiffs further pray that this Court retain jurisdiction to monitor and enforce compliance with the order and establish a requirement that Defendants report their compliance with the Act at such intervals as this Court deems appropriate.

94.     Award Plaintiffs their reasonable fees, costs, and expenses of litigation as

allowed by the Equal Access to Justice Act, 28 U.S.C. § 2412, *et seq.*, and/or other laws or rules of court;

95.    Grant Plaintiffs such further and additional relief as the evidence warrants and the Court deems just and proper.


Respectfully submitted this 27th of December, 2013.


Mark L. Pollot


By _____

Mark L. Pollot, Esq.
7227 West Potomac Drive
Boise, Idaho   83704
Telephone:    (208) 867-4335
E-mail:   mpollot.crc@centurylink.net

John W. Hoffman
Hoffman, Test, Guinan & Collier
429 West Plumb Lane
P. O. Box 187
Reno, NV 89504
Phone: (775) 322-4081
Facsimile: (775) 322-3841
Email: office@htag.reno.nv.us


COMPLAINT: Page 50 of  50